IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                              Criminal No. 3:08cr132

EDWARD H. OKUN

### MEMORANDUM OPINION

This matter is before the Court on the United States'
Statement of Issues as to Restitution Claims (Docket Number
312). Both before and during this litigation, several of the
Defendant's victims sold or assigned their bankruptcy claims to
a number of claim aggregating companies. The United States has
taken the position that the claims of those victims who assigned
their bankruptcy claims should not be included in the
restitution award and that, instead, the award should be made to
the aggregators that purchased the claims. The Defendant
agrees. For the reasons set forth below, the Court will award
restitution for the assigned claims to the aggregators, rather
than to the victims who assigned those claims.

### I. BACKGROUND

The Defendant, Edward H. Okun, was convicted of, inter
alia, several counts of wire fraud, money laundering, and
conspiracy to commit those offenses. Okun's scheme involved

appropriating money deposited in qualified intermediary ("QI") companies by individuals, known as exchangers, for his own benefit. The exchangers deposited the proceeds from the sales of various taxable capital assets with the QIs, seeking to take advantage of Section 1031 of the Internal Revenue Code. That section allows individuals to avoid the tax on the capital gains on such assets if they deposit the proceeds from the sales of those assets with a QI and convert those proceeds to an equivalent piece of property within a specified time period.

The evidence adduced at trial demonstrated that Okun removed the money deposited with the QIs from the insured bank accounts into which that money was to be deposited. Okun then spent that money to purchase assets for his own use and to support his lifestyle. Okun also was using some of the proceeds from those QIs to purchase other QIs for the purpose of using the funds deposited in those companies to keep his ever-expanding corporate family afloat. The evidence further demonstrated that Okun, his companies, and the related officers and employees were deceiving the exchangers as to the disposition of their deposited funds and the financial situation of the QIs. In sum, Okun was running a large, somewhat unconventional Ponzi scheme. That scheme resulted in the defrauding of hundreds of individuals and corporations, with a

total loss of exchanger funds of more than $100 million. (Gov. Rpt. at Exs. A-D.)

The parties have now agreed that restitution is due and owing to the vast majority of exchangers who have submitted claims for such restitution. (Consent Order at ¶ 1.) Four claims for restitution - those of Bear Valley Apartments, LLC, William Money, George Nanas, and Charles Sourmaidis - still need to be adjudicated, however. All four of these claims follow the same basic fact pattern.[1]

After the collapse of Okun's empire became apparent, a significant minority of exchangers sold all or part of their bankruptcy claims against Okun and/or Okun's companies to various claim aggregators, who paid a discounted price for those claims. (Gov. Final Rpt. at 2 n.2.) The majority of those exchanger/victims have not requested restitution from the Court in this matter - content, apparently, with the sale or assignment contracts that they made with the aggregators. The four above-listed exchanger/victims, however, seek to recover restitution, in the amount of the difference between the discounted price paid by the aggregator and the actual loss amount, in the face of their sale or assignment contracts to the

---

[1] The specific circumstances of each sale and other relevant facts respecting those transactions are discussed in Section II.b, supra.

-3-

contrary. The claim aggregators have also filed verification of loss ("VOL") forms requesting restitution based on the same claims, i.e., the bankruptcy claims that they purchased from the exchangers.

The United States and the Defendant both argue that the claim aggregators should be the recipient of the restitution, and that the original exchangers are no longer parties-in-interest. (Gov. Fin. Rpt. at 2, n.2.) For the reasons set forth below, the Court should award the restitution awards of the above-discussed exchangers to the claim aggregators, except for $343,000 of the claim made by George Nanas, which will be paid directly to him.

## II. DISCUSSION

### a. Assignability of Restitution Claims

The United States and the Defendant both argue that the claim aggregators to which the exchangers sold their claims should be considered as standing in the shoes of the various exchangers whose claims they've purchased. (Gov. Fin. Rpt. at 2, n.2.) The Mandatory Victims' Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A, 3664 provides the framework under which victims are to receive restitution for crimes such as Okun's.

The MVRA clearly contemplates that restitution payments can be assigned to individuals other than the victim: "The order of

-4-

restitution shall require that such defendant . . . return the [damaged, lost, or destroyed] property to the owner of the property *or someone designated by the owner*." 18 U.S.C. § 3663A(b)(1)(A)(emphasis added); see also United States v. Stephens, 374 F.3d 867, 871 (9th Cir. 2004) ("for crimes involving damage to or loss or destruction of property, both the owner of the property and someone designated by that owner can be awarded restitution by the district court."). Courts have recognized that money is property within the meaning of § 3663A. See, e.g., United States v. Crawley, 533 F.3d 349, 359 (5th Cir. 2008); United States v. Shepard, 269 F.3d 884, 887 (7th Cir. 2001). If Okun's restitution payments are regarded as the return of lost property, as they well could be, then they can be assigned to other beneficiaries through 18 U.S.C. § 3663A(b)(1)(A). See Crawley, 533 F.3d at 359 (restitution paid to compensate victim for stolen salary and pension funds was return of lost property within the meaning of the MVRA).

Furthermore, the Ninth Circuit has recognized that a victim can sell his restitution claim to a third party. See United States v. Turner, 312 F.3d 1137, 1142 (9th Cir. 2002). In Turner, two banks that were victims of a fraud scheme sold their restitution claims to a third party. See id. at 1140. That sale was completed after the defendant had been sentenced and the

-5-

restitution order issued. See id.  The Ninth Circuit stated that the assignments had "no effect on the amount finally owed. The only thing that has changed is the ultimate payee of the original debt." Id. at 1143.

The only factual distinction between Turner and this case is that the claim sale in Turner was completed after the restitution judgment was issued. See id. at 1140.  That fact is, however, of no analytical moment – there is no relevant conceptual or statutory difference between selling a claim that has been reduced to a judgment and one that has not.  Indeed, the steep discounts paid for the claims by the aggregators seem to take this added uncertainty into account.  Further, terms in the contracts make clear that the aggregators had considered the uncertain nature of the claims when purchasing them.

Other statutory provisions lend support to the conclusion that a crime victim can sell or assign his right to restitution. 18 U.S.C. § 3664(g)(2) provides that "A victim may at any time assign the victim's interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments.[2]"

---

[2] It might be argued that this statutory section forms the basis for invocation of the *expression unius est exclusio alterius* canon of statutory construction. See Laird v. Redwood Trust, LLC, 392 F.3d 661, 670 (4th Cir. 2004).  That canon, however,

Furthermore, 18 U.S.C. §§ 3664(f)(1)(B) and (j)(1) detail the appropriate procedure for use when the victim has "received or is entitled to receive compensation with respect to a loss from insurance *or any other source*." This statutory language can be fairly read to anticipate victims receiving compensation for their losses in a context outside that of insurance, such as a *quid pro quo* assignment or sale of the loss. The MVRA's sister statute, the Victim and Witness Protection Act ("VWPA"), also contains language ("or someone designated by the owner") that would seem to permit assignment or sale of claims. See 18 U.S.C. § 3663(b)(1)(A). Therefore, the MVRA is best read to permit the sale or assignment of restitution claims to third parties.

A construction of the statute permitting victims to assign or sell their claims to third parties also comports with the legislative history of the MVRA. The Fourth Circuit, examining the legislative intent of the statute, has stated that the purpose of the statute was to "ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society." United States v. Johnson, 400

can be "misleading" and should not be applied in the presence of statutory intent the contrary. See id. As noted above, such statutory intent is present here. Furthermore, at least one court, in considering the statutory text and legislative history behind § 3664(g)(2), has held that the provision is permissive rather than restrictive in nature. See United States v. Johnson, 378 F.3d 230, 245 (2d Cir. 2004).

-7-

F.3d 187, 200 n.4 (4th Cir. 2005).  That same legislative history evinces the legislative intent to require the defendant to reimburse a third party who compensates the victim for his loss. Id.

Allowing victims to sell or assign their claims before the entry of a restitution order upholds both of these purposes. Permitting such sales or assignments empowers victims by allowing them to receive immediate recompense for their harms without reducing the amount of restitution that will eventually be owed by the defendant.  The MVRA also recognizes that third parties may become interested in restitution proceeds and provides for those interests to be accommodated in the restitution process.  See id.  Therefore, nothing in the legislative history evinces the intent to prohibit victims from selling or assigning their claims to third parties.

Having determined that claims for restitution can be assigned or sold to third parties, the question remains as to whether the particular exchanger/victims at issue here actually completed such sales or assignments.

b. Individual Assignments/Sales

1. Bear Valley Apartments LLC

On April 12, 2007, Bear Valley Apartments LLC deposited $725,241.41 with the 1031 Tax Group pursuant to a written

-8-

exchange agreement. (Gov. Stmnt. at Ex. 3.)   The entirety of this deposit was lost when Okun's corporate empire crumbled. Bear Valley submitted its VOL form and associated documentation on December 19, 2008, at which time it had not yet sold its claim. (Id.)   On June 19, 2009, however, Bear Valley executed a "Claim Purchase Agreement" with ASM Capital, L.P., a claim aggregator. (See id.)

The Claim Purchase Agreement between Bear Valley and ASM provides that Bear Valley did

> absolutely and unconditionally sell, convey, and transfer to [ASM]. . . all of [Bear Valley's] right, title, benefit, and interest in and to any and all of [Bear Valley's] pre-petition claim or claims . . . against 1031 Tax Group in the Bankruptcy Court for the SouthernDistrict [sic] of New York . . . *and any other rights and benefits which may now exist, or come into existence in regards the Claim*, including all cash, securities, instruments, or other property to be paid or issued by [1031 Tax Group] or any other party, directly or indirectly, in connection with or satisfaction of the Claim, including . . . *all rights to receive interest, penalties, fees, and any damages from any cause of action, litigation, or rights of any nature against the Debtor, its affiliates, any guarantor or other third party in Court or any other court of competent jurisdiction* which may exist, be paid, or issued with respect to and/or in satisfaction of the Claim.

(Id.(emphasis added).)   The emphasized parts of the above contract language make clear that ASM was purchasing more than just Bear Valley's claim in the affiliated bankruptcy court, it

-9-

also purchased any recovery of funds on the debt underlying the bankruptcy claim in other litigation.

There can be no reasonable debate that the restitution claim and the bankruptcy claim are, in essence, the same claim. While it is true that, nominally, the bankruptcy claim is directed at 1031 Tax Group while the restitution claim is against Okun personally, both Okun and the Court have recognized that these claims are essentially the same. (See Def. Pos. at 1-2; Order dated August 1, 2008 at 1.)  Okun was the sole and controlling shareholder of 1031 Tax Group and that Okun's personal assets are available to satisfy either or both of the restitution or bankruptcy actions. (See Order dated August 1, 2008 at 1.)  Furthermore, examination of the supporting documentation submitted by Bear Valley and ASM reveals that the source of the claim against 1031 Tax Group in bankruptcy is the same as the restitution claim against Okun: the claim amounts, account numbers, and involved parties are all identical. (See Gov. Stmnt. at Ex. 3.)

Therefore, the record is clear that, under the terms of the "Claim Purchase Agreement," Bear Valley has sold its right to payment on the debt owed to it by Okun to ASM and the restitution order should direct that the relevant restitution amount be paid to ASM.

-10-

**2. William Money**

On April 19, 2007, William Money deposited $214,956.56 with Investment Exchange Group, LLC ("IXG"), one of Okun's subsidiary QIs, pursuant to a written exchange agreement. (Gov. Stmnt. at Ex. 4.) The entirety of this deposit was lost. Money submitted a VOL form and supporting documentation on December 28, 2008. (Id.) That VOL form indicates that, in August of 2007, Money sold his claim for $139,708.76 to Hain Capital Holdings ("HCH"), a claim-aggregator. (Id.) HCH has also filed a VOL for Money's claim, based on its contention that Money transferred his restitution claim to them along with his bankruptcy claim. (Id.)

HCH has provided an "Evidence of Transfer of Claim" that was evidently filed in the affiliated bankruptcy proceedings to support its contention that it purchased Money's claim. (Id.) This document, which has been signed by Money, states that "for value received" Money "unconditionally and irrevocably sells, transfers, and assigns to [HCH] all of [his] right, title, interest, claims, and causes of action in and to, and arising under or in connection with" his claim against IXG. (Id.)

This language, by its plain meaning, also transfers Money's right in the restitution judgment in this case, as that award would be a claim rising in connection with his bankruptcy claim against IXG. Indeed, Nanas admitted on his VOL form that he had

"sold the claim associated with this case" to HCH. (Gov. Stmnt. at Ex. 2, V.)   Therefore, the Court should award the restitution under this claim to HCH rather than Money.

### 3. George Nanas

The claim submitted by George Nanas presents a slightly different factual circumstance than the other three exchangers discussed herein.   On January 25-26, 2007, Nanas deposited $4,661,240.48 with 1031 Tax Group. (Stip. at ¶ 1.)   Thereafter, during March of 2007, Nanas received $743,000 in payments from the QI for deposits on replacement properties. (Id. at ¶ 2.) Nanas lost a $173,000 deposit on a replacement property as a direct result of Okun's fraud when the QI failed to have the necessary money for the purchase of the replacement property available at closing and paid a $50,000 penalty in order to avoid the loss of another deposit. (Id. at ¶ 3, 4.)   A third deposit for $120,000 was also made by the QI, but that deposit was returned to it. (Id. at ¶ 5.)   Therefore, the 1031 Tax Group continues to owe $4,038,240.48 on Nanas' deposit.

On September 14, 2007, Nanas d/b/a Soix Realty Corp. sold $3,916,740.48 of his claim to Stonehill Institutional Partners, L.P., a claim-aggregator. (Stmnt. at Ex. 2.)   This sale is reflected in Nanas' VOL, where he states that he received over $2 million in compensation. (Id.)   The "Assignment of Claim"

-12-

executed by Nanas provides that he transferred "all rights . . . relating to the Claim, including without limitation [Nanas'] rights to receive any interest, penalties, and fees relating to the Claim, all cash, securities, instruments, and other property which may be issued by Debtor in satisfaction of the claim, and all rights arising from the Proof of Claim identified below" except for consequential damages arising from "failure of the Debtor to perform its obligations with respect to the transactions underlying the Claim" and two other exceptions that are not relevant here. (Id.)

The United States argues, correctly, that the $173,000 lost deposit, the $120,000 returned deposit and the $50,000 penalty paid by Nanas would qualify under the first contractual exception listed above and therefore are "Excess Claims" that were not sold to Stonehill. (Id.) It is equally clear, however, that Nanas has completed the sale in his interest in the remainder of his claim against Okun/1031 Tax Group through his Assignment of Claim. The restitution claim is clearly related to the bankruptcy claim, and the contract signed by Nanas conveys any such interest "without limitation." Therefore, the restitution award should reflect that Stonehill is the owner of the underlying claim, except for the $343,000 in "Excess Claims" that Nanas did not convey to Stonehill.

### 4. Charles Sourmaidis

On April 9, 2007, Charles Sourmaidis deposited $3,210,491.43 with Atlantic Exchange Corp. ("AEC"), a QI affiliated with the Okun empire. (Gov. Stmnt. at Ex. 1.) AEC eventually paid Sourmaidis $1,285,274, leaving an outstanding claim balance of $1,952,217.43. On September 14, 2007, however, Sourmaidis sold the remainder of his claim to Stonehill. (Id.)

Sourmaidis' agreement with Stonehill provides that he conveyed all of his interest in the bankruptcy claim against 1031 Tax Group as well as "all rights . . . relating to the Claim, including without limitation [Sourmaidis'] rights to receive any interest, penalties, and fees relating to the Claim, all cash, securities, instruments, and other property which may be issued by Debtor in satisfaction of the claim, and all rights arising from the Proof of Claim identified below" except for consequential damages arising from "failure of the Debtor to perform its obligations with respect to the transactions underlying the Claim" and two other exceptions that are not relevant here. (Id.)

While this contract language is not as clear as that in the ASM and HCH contracts, the plain meaning of "all rights . . . relating to the claim" and the nonexclusive list of specifics that follows should be read to include the restitution award in

-14-

this case. (Id.)   That award clearly relates to the bankruptcy claim, as they are based on the same underlying series of transactions.   In addition, Sourmaidis admits that he sold the claim. (Id.)   Therefore, the restitution award based on those transactions should be awarded to Stonehill, rather than Sourmaidis.

## III. CONCLUSION

For the foregoing reasons, the restitution awards of the above-discussed exchangers will be awarded to the claim-aggregators, except for the $343,000 lost real estate deposit claimed by Nanas.

It is so ORDERED and the Restitution Order entered herein will so reflect.

                       /s/         _REP_

                  Robert E. Payne
                  Senior United States District Judge

Richmond, Virginia
Date: August 27, 2009